IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 7, 2016

## SHELLY MINOR v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**Nos. 08-06446, 09-07086     Lee V. Coffee, Judge**

_____

**No. W2015-01580-CCA-R3-PC – Filed July 15, 2016**

_____

The petitioner, Shelly Minor, appeals the post-conviction court's denial of his petition for post-conviction relief, arguing that he was denied the effective assistance of counsel. After review, we affirm the judgment of the post-conviction court denying the petition for post-conviction relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and J. ROSS DYER, JJ., joined.

Andrew R.E. Plunk, Memphis, Tennessee, for the appellant, Shelly Minor.

Herbert H. Slatery III, Attorney General and Reporter; Lacy Wilber, Senior Counsel; Amy P. Weirich, District Attorney General; and Karen Cook, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTS

The petitioner was convicted by a Shelby County Criminal Court jury of second degree murder, leaving the scene of an accident involving injury or death, driving while a habitual motor vehicle offender, driving under the influence ("DUI"), reckless driving, vehicular homicide by intoxication, and vehicular homicide by reckless conduct. At sentencing, the trial court merged the vehicular homicide convictions with the second degree murder conviction and merged the reckless driving conviction with the DUI conviction and sentenced the petitioner to an effective term of twenty-eight years, eleven months, and twenty-eight days. This court affirmed the judgments of the trial court on

direct appeal, and the Tennessee Supreme Court denied his application for permission to appeal. State v. Shelly Minor, No. W2010-01677-CCA-R3-CD, 2012 WL 3055776, at *1 (Tenn. Crim. App. July 26, 2012), perm. app. denied (Tenn. Jan. 22, 2013).

The underlying facts of the case were set out by this court on direct appeal as follows:

[The petitioner] and Lavatrice Street, the victim, were in a tumultuous relationship. Mrs. Street was married to Freddie Street, but the couple had been separated for ten to fifteen years at the time of the victim's death. [The petitioner] and the victim lived together at the victim's home from 2000 to November of 2007. According to friends and family members, the victim got tired of supporting [the petitioner] and told him to leave. [The petitioner] refused to leave the residence. After he was told to leave, [the petitioner] engaged in various abusive and violent behaviors directed at the victim ultimately culminating with the victim's death in January of 2008.

The police were called to the victim's home on December 4, 2007, after [the petitioner] broke the victim's cell phone and grabbed her by the neck. [The petitioner] threatened to beat her up or "do something" to her if she called the police. [The petitioner] even intentionally inflicted knife wounds on himself and tried to blame it on the victim. When the police arrived, [the petitioner] appeared to have been drinking. Police found a broken cell phone. The victim had urinated in her clothing out of fear of [the petitioner]. Police found the wet clothing in the house. During the police investigation, [the petitioner] admitted that he inflicted cuts on himself and tried to blame it on the victim. [The petitioner] was instructed by police to move his things out of the house. From that point on, [the petitioner] did not live with the victim.

After [the petitioner] moved out, he engaged in a series of acts of vandalism directed toward the victim. On December 5, 2007, there was a burglary call placed from the victim's home. The back window was broken, and there was blood on the door knob. The home was ransacked. The tags from the victim's vehicle were stolen. [The petitioner] was responsible. That same day, he chased the victim with a drill, threatening to kill the victim. She was so frightened that she again urinated in her clothing.

2

[The petitioner] slashed tires and drilled holes in the tires of cars belonging to the victim and two of her daughters. The victim had to buy and replace at least five sets of tires for her own vehicle due to [the petitioner's] actions.

On December 9, 2007, [the petitioner] came to the victim's home and banged on the door. When there was no answer, [the petitioner] cut the tires on the victim's car, cut the air conditioning and cable lines to the house, and broke a window. The victim saw [the petitioner] cut the tires and drain fluid from her car before going to the back of the home. The victim replaced the tires that day. A second vandalism call was placed after the victim's tires were slashed for the second time that same day. On December 10, 2007, the victim's tires were slashed again. The cuts were similar to the cuts in the tires made by [the petitioner] on previous occasions.

On December 11, 2007, the victim's home burned to the ground. The victim's daughters claimed that the victim was afraid to rebuild the home because she did not want [the petitioner] to know where she lived.

After her house burned to the ground, the victim moved in with her daughter, Knoishia Cunningham, and took a leave of absence from work, effective December 10, 2007, through January 3, 2008. The victim returned to work on January 2.

On December 16, 2007, the police were called when [the petitioner] discovered two bullet holes in his vehicle, a Volkswagen. [The petitioner] claimed that the victim was responsible. At that time, police ran the tags on [the petitioner's] car and learned that they were actually the victim's stolen tags.

The victim swore out a warrant against [the petitioner] for the events on December 10. She also referenced the events that took place on December 9 and 10 and filed for an order of protection. The victim did not appear at the hearing on the order of protection, so it was dismissed.

On December 24, 2007, Ms. Cunningham's tires were slashed while she was at work.

On January 16, 2008, the victim filed a theft report after the driver's side window was broken out of her Toyota 4Runner. The victim's checkbook, a cell phone, and some credit cards were stolen.

The next day, security cameras from the victim's place of employment showed a Volkswagen vehicle entering the parking lot at shift change. [The petitioner] drove a dark-colored Volkswagen. The Volkswagen followed a silver SUV out of the parking lot. A short time later, around 7:00 a.m. on January 17, a 911 call was placed from the victim's cell phone. The operator heard a scream before hearing nothing but noise like a television or a radio.

Shortly thereafter, officers witnessed a black Volkswagen with front end damage sitting on the side of Hacks Cross Road near Memphis. [The petitioner] was standing next to the car. The victim's Toyota 4Runner was down the street about two tenths of a mile from [the petitioner's] vehicle, on its side. It appeared that the 4Runner had traveled off the road into a utility pole. The victim was pinned under the vehicle with her head and upper torso visible. The victim was removed from the vehicle and transported to the hospital where she died of blunt force trauma.

[The petitioner] walked away from the scene, walking all the way to his mother's house to change out of "muddy" clothing. A beer can was found in [the petitioner's] vehicle. A Bible and document entitled "Dismissal of Order of Protection" were found in the victim's vehicle.

[The petitioner] was arrested shortly thereafter. He was indicted in September of 2008 by the Shelby County Grand Jury on charges of first degree murder, leaving the scene of an accident resulting in death, driving while being declared a habitual motor vehicle offender, driving under the influence, and reckless driving. In September of 2009, a separate indictment was issued charging [the petitioner] with vehicular homicide by intoxication and vehicular homicide by reckless conduct.

While [the petitioner] was incarcerated prior to trial, he called his mother from jail. During that telephone call, [the petitioner] told his mother that it was not his intent to kill the victim. He told his mother that the victim saw him driving behind her and rammed her vehicle into his vehicle. [The petitioner] also wondered why there was no arrest warrant for him if he were responsible for slashing the victim's tires.

4

At trial, an expert for the State opined that both vehicles were traveling in the same direction when [the petitioner's] vehicle hit the back of the victim's vehicle. It appeared both from the lack of mud on the right side of [the petitioner's] vehicle and the mud present on the left side of [the petitioner's] vehicle, that [the petitioner's] vehicle was close to the right side of the victim's vehicle as the victim's vehicle went off the road. In other words, the victim's car left the road after being struck by [the petitioner's] car.

[The petitioner] hired his own accident reconstructionist, Ralph Cunningham, to testify at trial. He agreed that [the petitioner's] vehicle struck the victim's vehicle while both traveled in the northbound lane. He guessed that [the petitioner's] vehicle was going approximately twenty-two miles per hour faster than the victim's vehicle at impact. Based on the markings on the road and position of the vehicle, he opined that the crash was caused by inappropriate steering input. Mr. Cunningham also opined that the victim hit the utility pole at a speed of twenty-four to thirty miles per hour before traveling another fifty feet as it rotated and flipped. Mr. Cunningham was of the opinion that the victim would have survived the crash if she had been wearing a seatbelt. He based this opinion on his personal experience of witnessing crash tests with crash test drivers.

Id. at *1-3 (footnotes omitted).

The petitioner filed a *pro se* petition for post-conviction relief on April 19, 2013, followed by an amended petition on August 23, 2013, after the appointment of counsel. Counsel subsequently withdrew, new counsel was appointed, and a "re-amended" petition was filed on July 21, 2015. In his petitions, the petitioner alleged various claims of ineffective assistance of trial counsel, including that counsel failed to apply for an out-of-state warrant to secure the appearance of a key witness at trial.

At the July 21, 2015 evidentiary hearing, trial counsel, who also represented the petitioner on direct appeal, testified that he filed a motion to continue the trial in an effort to locate a witness, Kelly Gilliam. Counsel said that Ms. Gilliam had observed what appeared to be the petitioner's vehicle strike the victim's vehicle one time from behind, which "pushed the victim's car forward slightly, and then [the victim] start[ed] swerving kind of left and right before she went off the road." Trial counsel said that Ms. Gilliam's testimony was important to the defense because their theory was that "there was just a single strike, that [the petitioner] wasn't intending to kill [the victim], that he just kind of hit her car and that she kind of overreacted and swerved, and [trial counsel] brought on an expert that kind of confirmed that." Trial counsel said that Ms. Gilliam had a conflict the

5

week of trial, in that she lived in Georgia and her exams for air traffic control school were scheduled for the same week. The trial court denied counsel's motion for a continuance. Counsel said that one of his issues raised on direct appeal was the denial of the motion and that this court determined that the denial was not error.

Trial counsel said that he did not file an out-of-state warrant for Ms. Gilliam because it was near the start of trial, he was unsure if he could effectuate it quickly, and he did not want to "sour[] one of the few good witnesses" the defense would have had. Counsel said he decided to "go forward with the expert proof [they] had, because the expert was pretty confident that it was a single strike." Counsel had wanted Ms. Gilliam to testify to corroborate the expert witness's testimony, but her testimony "wouldn't have been that much more important than what the expert said."

In response to questioning by the post-conviction court, trial counsel testified that he "litigated everything . . . about as fully as it could have been litigated." Counsel said he could not "think of a single thing" he could have done differently.

At the conclusion of the hearing, the post-conviction court made oral findings, including that the petitioner had "failed in his obligation to have witnesses in Court so that the Court can make a determination as to whether or not that witness's testimony would have made a difference in trial," and denied the petition. The court subsequently entered a detailed written order on August 14, 2015.

## ANALYSIS

The petitioner argues that trial counsel was ineffective for not securing Ms. Gilliam's appearance at trial. The State responds that because the petitioner did not call Ms. Gilliam to testify at the evidentiary hearing, "the post-conviction court correctly held that the petitioner had failed to meet his burden of showing he was entitled to post-conviction relief." We agree with the State.

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de*

6

*novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the test is satisfied by showing a reasonable probability, *i.e.*, a "probability sufficient to undermine confidence in the outcome" that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

With regard to the petitioner's claim, the post-conviction court's detailed findings are as follows:

"When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). This Court cannot speculate on what benefit the witnesses might have offered to the Petitioner's case nor guess as to what evidence further investigation may have uncovered. As the Petitioner has failed to produce Ms. Gilliam at the evidentiary hearing, the Petitioner asks the Court to engage in rank speculation as to how trial counsel's tactical decision not to compel the appearance of Ms. Gilliam could have made a difference in the outcome of this trial. The Petitioner has not shown that he was prejudiced or is entitled to relief on this issue. The Petitioner has had over five (5) years after trial to present evidence of Ms. Gilliam's likely testimony. The Petitioner has had over five (5) years after trial to secure an affidavit from Ms. Gilliam about what she saw on the day of the accident or to subpoena Ms. Gilliam to ensure her appearance at the post-conviction evidentiary hearing. Ms. Gilliam['s] testimony or an affidavit was not offered at the evidentiary hearing. This issue is without merit.

. . . .

The evidence in this case was overwhelmingly strong. The Petitioner could have easily been convicted of First Degree Murder in the killing of [the victim]. Trial counsel provided exceptional representation in securing a conviction for the lesser offense of Second Degree Murder for this Petitioner. This Petitioner has wholly failed to prove that counsel were ineffective, the Petitioner has wholly failed to demonstrate any prejudice.

The record supports the determination of the post-conviction court. The petitioner has not shown a "probability sufficient to undermine confidence in the outcome" that the result of the outcome would have been different had the jury heard the testimony he says should have been presented. See Strickland, 466 U.S. at 694. We, therefore, affirm the judgment of the post-conviction court denying the petition.

## CONCLUSION

Based upon the foregoing authorities and reasoning, the judgment of the post-conviction court is affirmed.

_____
ALAN E. GLENN, JUDGE